# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Angela D. Keene, Individually and as Personal Representative of the Estate of Dennis Seay, Deceased, and Linda Seay, Respondents,

v.

CNA Holdings, LLC, Petitioner.

Appellate Case No. 2019-000816

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Spartanburg County
D. Garrison Hill, Circuit Court Judge

---

Opinion No. 28052
Heard June 11, 2020 – Filed August 11, 2021

---

## AFFIRMED

---

Richard C. Godfrey, Kirkland & Ellis LLP, of Chicago, IL; C. Mitchell Brown, Allen Mattison Bogan, and Blake Terence Williams, Nelson Mullins Riley & Scarborough, LLP, of Columbia, all for Petitioner.

Bert Glenn Utsey III, Clawson Fargnoli & Utsey, LLC, of Charleston; Theile Branham McVey and John D. Kassel, Kassel McVey, of Columbia; Kevin W. Paul, Dean Omar Branham Shirley, LLP, of Dallas, TX; Chris Panatier,

Simon Greenstone Panatier, PC, of Dallas, TX, all for Respondents.

---

**JUSTICE FEW:** For eighty-two years, this Court struggled to correctly apply sections 42-1-400 and -410 of The South Carolina Workers' Compensation Law, which are collectively referred to as the "statutory employee doctrine." The resulting body of jurisprudence is confusing, often conflicting, and always difficult for the workers' compensation commission and the circuit court to apply. This difficulty has become particularly apparent in the modern economy in which subcontracting work a company could do with its own employees is such an important and legitimate business practice. Today, following our more recent decisions on the statutory employee doctrine, we apply the doctrine in light of the General Assembly's original purpose for enacting it: "to prevent owners and contractors from subcontracting out their work to avoid liability for injuries incurred in the course of employment." *Glass v. Dow Chem. Co.*, 325 S.C. 198, 201 n.1, 482 S.E.2d 49, 50 n.1 (1997). We find the circuit court and the court of appeals correctly determined the injured worker in this case was not the statutory employee of the defendant.

## I.      Facts and Procedural History

Hystron Fibers Incorporated hired Daniel Construction Company in 1965 to build a polyester fiber plant in Spartanburg, South Carolina. When the plant began operating in 1967, Hystron retained Daniel to provide all maintenance and repair workers at the plant. Hystron soon became Hoechst Fibers Incorporated. Pursuant to a series of written contracts, Hoechst paid Daniel an annual fee and reimbursed Daniel for certain costs. The contracts required Daniel to purchase workers' compensation insurance for the workers and required Hoechst to reimburse Daniel for the workers' compensation insurance premiums.

Dennis Seay was employed by Daniel. Seay worked various maintenance and repair positions at the Hoechst plant from 1971 until 1980. The manufacture of polyester fibers required the piping of very hot liquid polyester through asbestos-insulated pipes. Seay's day-to-day tasks involved maintaining and repairing pumps, valves, condensers, and other equipment in the piping network, all of which exposed him to asbestos. He eventually developed lung problems, which were later diagnosed as mesothelioma, a cancer caused by inhaling asbestos fibers.

Seay and his wife filed this lawsuit against CNA Holdings—Hoechst's corporate successor[1]—claiming Hoechst acted negligently in using asbestos and in failing to warn of its dangers. After Seay died from mesothelioma, his daughter—Angie Keene—took over the lawsuit as personal representative of his estate. Keene amended the complaint to add survival and wrongful death causes of action.

Throughout the litigation, CNA Holdings argued Seay was a statutory employee and the Workers' Compensation Law provided the exclusive remedy for his claims. The circuit court disagreed and denied CNA Holdings' motion for summary judgment. A Spartanburg County jury awarded Seay's estate $14 million in actual damages and $2 million in punitive damages. The trial court denied CNA Holdings' motion for judgment notwithstanding the verdict, again finding Seay was not a statutory employee. The court of appeals affirmed. *Keene v. CNA Holdings, LLC*, 426 S.C. 357, 376, 827 S.E.2d 183, 193 (Ct. App. 2019).[2]

## II.    Analysis

When our General Assembly enacted the original "Workmen's Compensation Act" in 1936[3]—now officially named The South Carolina Workers' Compensation Law[4]—it included the statutory employee doctrine, now found in sections 42-1-400 and -410 of the South Carolina Code (2015). Section 42-1-400—the section applicable in this case—provides,

---

[1] Hoechst Fibers Incorporated later became Hoechst Fibers Industries. After Seay left in 1980, the company became Hoechst Celanese, then Celanese, then CNA Holdings.

[2] The court of appeals considered other grounds on which CNA Holdings challenged the jury verdict. *See* 426 S.C. at 376-87, 827 S.E.2d at 193-99. CNA Holdings does not raise any of those other issues to this Court.

[3] Act No. 610, 1936 S.C. Acts 1231.

[4] The General Assembly changed the name of the Act in 1982 to The South Carolina Workers' Compensation Law, and provided, "All references in this title to 'workmen's compensation' shall mean 'workers' compensation.'" Act. No. 303, 1982 S.C. Acts 2027; S.C. Code Ann. § 42-1-10 (2015).

> When any person, in this section . . . referred to as "owner," undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section . . . referred to as "subcontractor") for the execution or performance by . . . such subcontractor of . . . any part of the work undertaken by such owner, the owner shall be liable to pay to any work[er] employed in the work any compensation under this title which he would have been liable to pay if the work[er] had been immediately employed by him.

At the time of the original Act, it was feared employers would reject the new expense of insuring workers and find ways to avoid that expense by contracting out "part of [their] trade, business or occupation" to a subcontractor. As we stated on our first review of the statutory employee doctrine in 1939, "It is easily conceivable that [an employer] may let a part of the work to be done to others who are financially irresponsible, and that the employee . . . who is injured while doing the work is left without remedy." *Marchbanks v. Duke Power Co.*, 190 S.C. 336, 363, 2 S.E.2d 825, 836 (1939).

Our General Assembly enacted the statutory employee doctrine—as did the legislatures of most states across the country[5]—"to forestall evasion of the act by those who might be tempted to subdivide their regular operations among subcontractors, thus escaping direct employment relations with the workers . . . ." Lex K. Larson et al., LARSON'S WORKERS' COMPENSATION LAW § 70.05 (2020); *see also id.* § 70.04 ("The purpose of this legislation was to protect employees of irresponsible and uninsured subcontractors . . . ."); Grady L. Beard, et al., THE LAW OF WORKERS' COMPENSATION INSURANCE IN SOUTH CAROLINA, Statutory Employers: Liability of Owners 43 (6th ed. 2012) (explaining the General Assembly enacted the statutory employee doctrine because "it would not be fair to relieve the owner of compensation to employees doing work which was a part of his trade or business by permitting such owner to sublet or subcontract some part of said work"). As we stated in *Glass*, the purpose of the statutory employee doctrine "is to prevent owners and contractors from subcontracting out their work to avoid liability for

---

[5] *See* Lex K. Larson et al., LARSON'S WORKERS' COMPENSATION LAW § 70.01 (2020) (stating, "Four-fifths of the states have adopted 'contractor-under' statutes, imposing on the general employer compensation liability . . . to the employees of contractors . . . under it").

injuries incurred in the course of employment."  325 S.C. at 201 n.1, 482 S.E.2d at 50 n.1.

In the early years of interpreting the predecessor statutes to sections 42-1-400 and -410, this Court viewed the scope of an employer's "trade, business or occupation" quite broadly.  *Marchbanks* itself is a good example.  Duke Power Company hired Coln—a contractor—to paint 170 metal power poles in the City of Greenville for one dollar apiece.  190 S.C. at 338, 2 S.E.2d at 826.  Duke Power hired a contractor to paint the poles approximately every two years.  *Id.*  The plaintiff was an employee of Coln, not Duke Power.  *Id.*  In the course of his work painting the poles, the plaintiff came into contact with a hot wire he later claimed was defective.  190 S.C. at 357, 2 S.E.2d at 834.  The plaintiff sued Duke Power and Coln in circuit court for negligence in causing his injuries.  *Id.*  We affirmed the circuit court's finding the plaintiff was Duke Power's statutory employee, stating,

> [I]t is difficult to see how the power company could carry on its business if its lines of wires were not kept in sound condition, or how this could be done if the posts to which they are attached were not kept in safe and sound condition.  Evidently it was necessary to this end that the poles be "protected from the weather," and the appellant was engaged about this work. . . .  Surely it cannot be seriously argued that the unfortunate employee was not engaged in work "which is a part of the trade, business or occupation" of the power company which it was undertaking to have performed.

190 S.C. at 365-66, 2 S.E.2d at 837.

In *Boseman v. Pacific Mills*, 193 S.C. 479, 8 S.E.2d 878 (1940)—an appeal from the industrial commission[6]—the claimant was an employee of a contractor whom Pacific Mills hired to paint a water tower at its Granby Plant in Columbia.  193 S.C. at 480, 8 S.E.2d at 878.  While the claimant and a co-worker were painting the tank, it caught fire and exploded, burning both men to death.  *Id.*  We stated, "The only question for our consideration . . . is whether the deceased . . . was performing work

---

[6] The 1936 Act created the South Carolina industrial commission to hear claims under the Act.  Act No. 610, 1936 S.C. Acts 1231, 1255.  The General Assembly renamed the commission the workers' compensation commission in 1986.  Act. No. 399, 1986 S.C. Acts 2716, 2718.

which was a part of the trade, business or occupation of the Pacific Mills." 193 S.C. at 481, 8 S.E.2d at 879.  Finding the claimant was the statutory employee of Pacific Mills, we stated,

> The tank was an integral part of the mill business. . . .  The very nature of the work done by the mill, that of the manufacture of cotton into cloth, especially required the best of protection against fire.  Hence, this tank was particularly necessary and essential in the operation and carrying on of the business of the mill.  It, therefore, follows that the painting of the tank was such a part of the trade, business or occupation of the Pacific Mills . . . .

193 S.C. at 483, 8 S.E.2d at 880.

We continued for decades to interpret the phrase "trade, business or occupation" broadly to include any work we deemed necessary to the owner's business.  In *Bell v. South Carolina Electric & Gas Co.*, 234 S.C. 577, 109 S.E.2d 441 (1959), we applied our broad interpretation to maintenance and repair workers.  Relying on *Marchbanks*, *Boseman*, and other cases, we stated, "The defendant Power Company is . . . engaged in the manufacture and transmission of electricity and uses poles and wires in its business and the repair and maintenance of such poles and wires . . . are part of its business, trade and occupation."  234 S.C. at 580-81, 109 S.E.2d at 442.

From *Bell* in 1959 to *Glass* in 1997, most of our decisions were consistent with this broad view of "trade, business or occupation."  In its brief, CNA Holdings correctly characterizes these cases as, "A long line of South Carolina decisions [that] have held that maintenance workers are statutory employees of manufacturing businesses."  CNA Holdings argues "the Court of Appeals cast aside all of these cases, which provide significant, direct support for [our] position that Seay's maintenance work was an important, necessary, integral, and essential part of [our] manufacturing business."  While we disagree the court of appeals "cast aside" anything, we do agree that its decision in this case cannot be reconciled with the broad view we took of an employer's "trade, business or occupation" in those early cases.  If the infrequently-performed work the subcontracted employees performed in *Marchbanks*, *Boseman*, and *Bell* qualified for statutory employee status, it is difficult to imagine the regular—daily, in fact—maintenance and repair work Seay and his co-workers performed at Hoechst does not also qualify.

The reality, however, is that none of our recent jurisprudence on this question is consistent with the broad interpretation of "trade, business or occupation" in our original cases. Shortly after *Bell*, even as we viewed the scope of a company's "trade, business or occupation" broadly in most of our cases, we began a series of cases in which we narrowed our original view. In *Bridges v. Wyandotte Worsted Co.*, 243 S.C. 1, 132 S.E.2d 18 (1963), *overruled on other grounds by Sabb v. South Carolina State University*, 350 S.C. 416, 422-23 n.2, 567 S.E.2d 231, 234 n.2 (2002), we said, "It is especially difficult to lay down any hard and fast rule with regard to such activities as repair and maintenance," because "[t]he practices of different concerns operating in the same field often vary." 243 S.C. at 11, 132 S.E.2d at 23. Our point was that different business managers make legitimate choices about the scope of their company's business based on circumstances the manager deems important to the company. We illustrated the point with an example from LARSON'S WORKMEN'S COMPENSATION LAW. "For example," we stated, "activities which would be unusual and out of the ordinary in a small business might be a normal activity for a large concern." *Id.* (citing Arthur Larson & Lex K. Larson, LARSON'S WORKMEN'S COMPENSATION LAW § 49.12 (1st ed. 1952)).

The defendant in *Bridges* owned an electric transmission line at its plant at Conestee. 243 S.C. at 4, 132 S.E.2d at 19. Ordinarily, "The defendant regularly employed a crew of men who maintained the electrical system, two of whom were experienced and competent electricians in the handling of electrical work on energized, or so-called 'hot' electrical lines." 243 S.C. at 5, 132 S.E.2d at 19. In other words, the defendant's management made a business decision to have its own employees handle the work of maintaining and replacing electric transmission lines. On the day the plaintiff was injured, however, "due to the excessive amount of overtime that its men had already worked, the defendant . . . contracted with . . . an electrical contractor," the plaintiff's immediate employer, "to do the work." 243 S.C. at 5, 132 S.E.2d at 20. Despite the temporary change, we honored the original business decision, stating, "The maintenance and repair of its electrical system was, therefore, made a part of the work done by the defendant in the prosecution of its business of manufacturing woolen goods." 243 S.C. at 12, 132 S.E.2d at 23. The fact the work was performed on one occasion by a contractor did not change the defendant's business decision to include maintenance and repair of its electrical system as a part of its business. We held the employees of the contractor were statutory employees. *Id.*

The next case in the series—ironically—involved Daniel, which by then had become Daniel International Corporation. *Wilson v. Daniel Int'l Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973). Daniel contracted to build an industrial plant in Georgetown.

260 S.C. at 551, 197 S.E.2d at 687. Daniel had three options for getting the concrete it needed to build the plant: purchase concrete from an outside source, get concrete made by Daniel employees from its concrete division, or have Daniel employees mix concrete onsite. 260 S.C. at 553, 197 S.E.2d at 688. Because it decided a "purchase from an outside source . . . was the most economical," Daniel chose not to use its own employees. 260 S.C. at 553-54, 197 S.E.2d at 688. In finding the injured employee of the concrete supplier was not a statutory employee, we relied primarily on our finding he worked for the seller of material. 260 S.C. at 553-54, 197 S.E.2d at 688-89. However, our recognition of the importance of corporate decision making is inescapable. If Daniel had not chosen—for economic reasons—to use a contractor for this particular job, its own employees would have been doing the work.

In *Glass*, we recognized that not all work "necessary" for the owner to "carry on its business"—the standard we used in *Marchbanks* and *Boseman*—was "part of his . . . business" under section 42-1-400. *Glass* arose after the Medical University of South Carolina negotiated the settlement of a dispute with Dow Chemical Company over cracking in exterior panels installed on a building at its campus in Charleston. 325 S.C. at 200, 482 S.E.2d at 50. Dow agreed to settle the dispute by removing the old panels and replacing them. *Id.* To carry out the settlement, Dow hired a supervising contractor, who hired a removal contractor, who hired River City Rigging to provide welders. *Id.* We specifically recognized that "where repairs are major, specialized, or of the sort which the employer is not equipped to handle with its own work force, they are not part of the business." 325 S.C. at 202, 482 S.E.2d at 51 (citing Arthur Larson & Lex K. Larson, THE LAW OF WORKMEN'S COMPENSATION § 49.16(e) (2nd ed. 1996)). Applying that principle to the facts of *Glass*, we stated, "Here, the major task of dismantling the outer walls . . . and of completely replacing facade panels required technical knowledge that was highly specialized. Additionally, Dow was completely unable to handle the repairs with its own work force because its immediate employees were not trained in construction." 325 S.C. at 202, 482 S.E.2d at 51. In finding the injured employee of the concrete supplier was not a statutory employee, we relied primarily on our finding that the employees' "activities were not related to the basic operation of Dow's business," but "stemmed simply from Dow's desire to avoid litigation costs." *Id.* We recognized, however, that corporate managers often choose not to make major or otherwise specialized repairs part of their business.

Three years after *Glass*, we decided the first of two cases from the transportation industry, whose applicability beyond the transportation context became a significant issue in this case at the court of appeals. In *Abbott v. The Limited, Inc.*, 338 S.C.

161, 526 S.E.2d 513 (2000), a truck driver delivering goods to a retail store "was injured when he slipped and fell while unloading boxes on Retailer's premises." 338 S.C. at 162, 526 S.E.2d at 514. The circuit court dismissed the employee's tort action under the statutory employee doctrine and the court of appeals affirmed. *Id.* The court of appeals held that when work is "an important part . . . [or] . . . a necessary, essential, and integral part" of the business of the employer, the worker is the statutory employee of the business. *Abbott v. The Ltd., Inc.*, 332 S.C. 171, 174, 503 S.E.2d 494, 496 (Ct. App. 1998) (citations omitted), *rev'd*, 338 S.C. 161, 526 S.E.2d 513. The court of appeals stated,

> We agree with the trial court that the prompt and efficient delivery of goods for the purpose of stocking its retail stores is an integral and essential part of [the retailer]'s business. [The retailer] could not operate a retail business without stock. Because [the truck driver]'s work was at least 'important' to [the retailer]'s business, the trial court properly deemed him a statutory employee.

332 S.C. at 174-75, 503 S.E.2d at 496.

We reversed, explaining, "The fact that it was important to Retailer to *receive* goods does not render the delivery of goods an important part of Retailer's business." 338 S.C. at 163, 526 S.E.2d at 514.

Three years after *Abbott*, we decided the second transportation case, *Olmstead v. Shakespeare*, 354 S.C. 421, 581 S.E.2d 483 (2003). We held "*Abbott* is not limited to receipt of goods cases, but applies equally to delivery of goods cases as long as the transportation of goods is *not the primary business* of the company to whom or from whom goods are being delivered." 354 S.C. at 425, 581 S.E.2d at 485 (emphasis added).

In this case, the court of appeals recognized this Court changed its interpretation of the statutory employee doctrine from *Bridges* through *Wilson* and *Glass*, culminating in *Abbott* and *Olmstead*. Addressing the parties' argument over whether this Court intended *Abbott* and *Olmstead* to apply outside the transportation context, the court of appeals stated "the logic employed by the court in *Abbott* and *Olmstead* brought new clarity to the abundance of case law on this issue and this logic is binding in the present case." *Keene*, 426 S.C. at 370, 827 S.E.2d at 190. The court of appeals continued,

In sum, the analysis in *Abbott* and *Olmstead* is true to the legislative intent underlying section 42-1-400, which seeks to determine whether the type of work performed by the worker is the same type of work "the owner" has established as its business, and its logic applies across all trades, businesses, and occupations, allowing each case to be decided on its own facts.

426 S.C. at 370, 827 S.E.2d at 190-91.

We agree with the court of appeals. Looking back on *Bridges*, *Wilson*, *Glass*, *Abbott*, and *Olmstead*, the concepts we discussed in those cases are relevant to the analysis of this case and all statutory employee cases. In each case, we acknowledged things have changed since the time of *Marchbanks* and *Boseman*. In *Bridges*, we put value on the business decisions of management. 243 S.C. at 12, 132 S.E.2d at 23. In *Wilson*, we honored Daniel's decision to remove the provision of concrete from the scope of its business even though Daniel's own employees did the same work on other jobsites. 260 S.C. at 553-54, 197 S.E.2d at 688. In *Glass*, we recognized that "major" repairs, "specialized" work, and jobs "of the sort which the employer is not equipped to handle with its own work force" are "not [necessarily] part of the business" of the owner. 325 S.C. at 202, 482 S.E.2d at 51. In *Abbott*, we held that just because work is *important to* a business does not mean the work is *part of* the business. 338 S.C. at 163, 526 S.E.2d at 514. In *Olmstead*, we clarified that "*Abbott* represents a change in this state's jurisprudence on what activity constitutes 'part of [the owner's] trade, business or occupation' under section 42-1-400," and we "overrule[d] all prior cases to the extent they are in conflict with our holding in *Abbott*," 354 S.C. at 426-27, 581 S.E.2d at 486 (first alteration in original). The trend away from *Marchbanks* and *Boseman*—and the broad view of an employer's "trade, business or occupation" those opinions represented—was firmly established by this Court by the time this case reached the court of appeals.

CNA Holdings argues the decisions of the circuit court and the court of appeals in this case refusing to apply the statutory employee doctrine "conflict with the public policy favoring inclusion under the Workers' Compensation Law." The applicable public policy, however, is to ensure that workers are covered under the Workers' Compensation Law. *Glass*, 325 S.C. at 201 n.1, 482 S.E.2d at 50 n.1; Larson et al., *supra*, §§ 70.04, 70.05. It does not matter to the fulfillment of this policy who provides the coverage. Here, Hoechst contracted out the maintenance and repair work to a sophisticated international construction company—Daniel Construction—not to a financially irresponsible subcontractor without the capacity to insure its

workers.  But Hoechst went further—to its credit—and mandated through contract that the maintenance workers would be insured.  The decisions of the circuit court, the court of appeals, and now this Court, in no way frustrate the policy of the statutory employee doctrine or the Workers' Compensation Law.

It is also important to note that the public policy at issue here is not to provide civil immunity to employers like Hoechst or their corporate successors like CNA Holdings.  In *Olmstead*, the court of appeals wrote "the underlying rationale" of favoring coverage for workers "is not as pertinent where the statutory employee definition and exclusive remedy provision are used as a shield to prevent recovery under another theory."  *Olmstead v. Shakespeare*, 348 S.C. 436, 441, 559 S.E.2d 370, 373 (Ct. App. 2002), *aff'd as modified*, 354 S.C. 421, 581 S.E.2d 483.  On review of that statement, this Court "decline[d]" to "adopt[] a different standard of review for cases in which the workers' compensation statute is used as a shield to liability."  354 S.C. at 427, 581 S.E.2d at 486.  We decline again to do so today.  Certainly, when the public policy behind the statutory employee doctrine leads to a finding that a worker is a statutory employee, the collateral consequence of that finding is the claim against the owner must be filed with the workers' compensation commission.  In that event, the owner collaterally enjoys immunity from tort liability.  However, when the public policy favoring coverage is satisfied—as it was here—that policy has nothing to say about providing immunity to the owner.  For these reasons, CNA Holdings' argument that public policy supports its position is misplaced.

The question posed by section 42-1-400 today is the same key question we addressed in *Marchbanks*: whether the work contracted out is "part of [the owner's] trade, business or occupation."  Over time, we developed what we called "tests" for courts and the workers' compensation commission to use in answering the key question.  *See Keene*, 426 S.C. at 368, 827 S.E.2d at 189 (reciting the "three tests" and stating they "were first articulated by our supreme court in 1988 . . . by drawing on" *Bridges*, *Boseman*, and *Marchbanks* (first citing *Olmstead*, 354 S.C. at 424, 581 S.E.2d at 485; then citing *Ost v. Integrated Prods., Inc.*, 296 S.C. 241, 245, 371 S.E.2d 796, 798-99 (1988))).  While each test remains a valid consideration, today we refocus on the key question posed by the statute.

In answering the question posed by section 42-1-400—whether the work contracted out is "part of [the owner's] trade, business or occupation"—the court should focus initially on what the owner decided is part of its business.  Increasingly, business managers are outsourcing work that formerly was handled as a part of the business, and they are doing so to meet the ever-increasing competitive challenges businesses

face.  *See* Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. Rev. 1673, 1676 (2016) ("Since the end of the Great Recession, U.S. businesses have aggressively engaged in a series of organizational changes—from classifying workers as independent contractors, to hiring subcontractors, to utilizing staffing agencies—to delegate employment-related responsibilities to outsiders.").  In reality, therefore, what is or is not "part of" the owner's business is a question of business judgment, not law.  If a business manager reasonably believes her workforce is not equipped to handle a certain job, or the financial or other business interests of her company are served by outsourcing the work, and if the decision to do so is not driven by a desire to avoid the cost of insuring workers, then the business manager has legitimately defined the scope of her company's business to not include that particular work.

In this case, there is no question Hoechst made a legitimate business decision to outsource its maintenance and repair work.  Hoechst clearly had no intention of avoiding the cost of insuring the workers who did the work against work-related injuries.  In fact, "to its credit" as we stated, Hoechst provided in its contract with Daniel that the workers must be insured and Hoechst would pay for it.  Hoechst business managers considered the economic interests of the company and determined maintenance and repair was not "work which is a part of [its] trade, business or occupation."  § 42-1-400.  As the court of appeals summarized,

> [T]he unique facts of the present case [demonstrate] that Seay's work, while important to the manufacturing process performed by [Hoescht] employees, was not part of that process . . . .  Only Daniel employees performed maintenance and repairs on the equipment in the Spartanburg plant.  None of the [Hoechst] employees performed this type of work. . . .  [Hoechst] contracted with Daniel because it was "a qualified, capable contractor that can do the *expert* work that [Hoechst] needed done, both in construction and maintenance.  As aptly noted by the circuit court, [Hoechst] "has presented no evidence that its corporate purpose included equipment maintenance."

426 S.C. at 374-75, 827 S.E.2d at 193.

The original purpose of the statutory employee doctrine was to prevent business managers from outsourcing work for the purpose of avoiding workers' compensation

costs.  That purpose has nothing to do with outsourcing work for legitimate business reasons.  Moreover, unlike the economy of 1936, it has become standard in the modern economy for businesses to bear the cost of insuring workers against injury.  Seay's family presumably received the worker's compensation benefits Hoechst obligated through contract that Daniel must provide.  The original purposes of the statutory employee doctrine are not served by making CNA Holdings an additional provider of workers' compensation benefits, because Daniel provided those benefits.  The original purposes are certainly not served by granting CNA Holdings immunity for its wrongful conduct.  It is not the role of courts to second-guess a legitimate business decision whose effect—far from the improper purposes the statutory employee doctrine was designed to prevent—was actually to guarantee that the workers affected by the decision would be insured against work-related injuries.

### III.    Conclusion

The court of appeals correctly affirmed the circuit court's determination that Seay was not the statutory employee of Hoechst.  We affirm.

**AFFIRMED.**

**BEATTY, C.J., and HEARN, J., concur.  JAMES, J., dissenting in a separate opinion in which KITTREDGE, J., concurs.**

**JUSTICE JAMES:**  I respectfully dissent.  I would hold Mr. Seay was a statutory employee of Hoechst Celanese and would therefore reverse the court of appeals.

I disagree with the majority as to how we should read *Abbott v. The Limited, Inc.*, 338 S.C. 161, 526 S.E.2d 513 (2000) and *Olmstead v. Shakespeare*, 354 S.C. 421, 581 S.E.2d 483 (2003).  I also disagree with the majority's apparent approval of a different standard for reviewing the application of the statutory employee doctrine, depending upon whether the worker invokes the doctrine to obtain workers' compensation benefits or whether the owner invokes the doctrine as a defense to civil liability.

I.

A. *Abbott* and *Olmstead*

We stated in *Olmstead* that "*Abbott* represents a change in this state's jurisprudence on what activity constitutes 'part of the owner's trade, business or occupation' under section 42-1-400."  354 S.C. at 426, 581 S.E.2d at 486.  I believe any "change" recognized by the *Olmstead* Court is limited to transportation cases.  That is the only reasonable way to view the *Olmstead* opinion.  We specifically noted in *Olmstead* that *Abbott* involved the delivery of goods <u>to</u> the alleged statutory employer and that *Olmstead* involved the delivery of goods <u>from</u> the alleged statutory employer.  *Id*. at 425, 581 S.E.2d at 485.  We then held the court of appeals correctly concluded "that *Abbott* is not limited to receipt of goods cases, but applies equally to delivery of goods cases as long as the transportation of goods is not the primary business of the company to whom or from whom goods are being delivered."  *Id*.  I believe the limitation of *Abbott* and *Olmstead* to the transportation context is further manifested by this observation in *Olmstead*:

> *Abbott* does not change the need for this case by case analysis; *Abbott* merely establishes that transportation of goods is important to nearly all businesses, and, that transportation of goods by a common carrier alone, without something more, does not qualify as "part of [the owner's] trade, business, or occupation" under any of the three established tests for statutory employment.

*Id.* at 426, 581 S.E.2d at 486.

In light of our decisions in *Abbott* and *Olmstead*, it is easy to understand why the *Abbott* Court overruled the court of appeals' transportation-related decisions in *Neese v. Michelin Tire Corp.*, 324 S.C. 465, 478 S.E.2d 91 (Ct. App. 1996) and

*Hairston v. Re: Leasing, Inc.*, 286 S.C. 493, 334 S.E.2d 825 (Ct. App. 1985). In *Olmstead*, we went on to "overrule all prior cases to the extent they are in conflict with our holding in *Abbott* and now in this case." *Id.* at 427, 581 S.E.2d at 486. When *Olmstead* was decided, *Marchbanks*, *Boseman*, *Bell*, *Bridges*, *Glass*, and other non-transportation cases were there for the picking to be overruled in whole or in part, but they were not.

### B. Seay's Status

Regardless of whether *Abbott* and *Olmstead* are limited to transportation cases, I would hold that under the facts of this case, Seay was Hoechst's statutory employee. The three tests for determining whether a worker is a statutory employee have not changed. We must consider whether the worker's activities "(1) are an important part of the trade or business of the employer, (2) are a necessary, essential, and integral part of the business of the employer, or (3) have been previously performed by employees of the employer." *Glass v. Dow Chem. Co.*, 325 S.C. 198, 201, 482 S.E.2d 49, 50 (1997). Perhaps the first and second tests are the same, but whatever the case, the worker's employment activities need only meet one of the three tests for the worker to be a statutory employee. Seay's activities at the Hoechst plant met the first two tests.

The majority writes that our decisions in *Marchbanks v. Duke Power Co.*,[7] *Boseman v. Pacific Mills*,[8] *Bell v. South Carolina Electric & Gas Co.*,[9] and *Glass* were consistent with a broad view of what was part of an owner's "trade, business, or occupation." The majority concedes it is hard to imagine that in light of those decisions, Seay was not a statutory employee of Hoechst. I agree, and I would stop the analysis there and hold Seay was Hoechst's statutory employee. However, the majority concludes our analysis of the statutory employment issue has narrowed over the years and compels a different result, so I must go further.

The majority believes that beginning with our 1963 decision in *Bridges v. Wyandotte Worsted Co.*,[10] "we began a series of cases in which we narrowed our original view."

---

[7] 190 S.C. 336, 2 S.E.2d 825 (1939).

[8] 193 S.C. 479, 8 S.E.2d 878 (1940).

[9] 234 S.C. 577, 109 S.E.2d 441 (1959).

[10] 243 S.C. 1, 132 S.E.2d 18 (1963), *overruled on other grounds by Sabb v. South Carolina State University*, 350 S.C. 416, 422 n.2, 567 S.E.2d 231, 234 n.2 (2002).

I disagree with that statement for two reasons. First, the majority cites the following language in *Bridges* that it claims supports our evolving view: "It is especially difficult to lay down any hard and fast rule with regard to such activities as repair and maintenance," because "[t]he practices of different concerns operating in the same field often vary." 243 S.C. at 11, 132 S.E.2d at 23. In our 1939 decision in *Marchbanks*, a case dealing with maintenance of power poles, we noted the difficulty in determining whether a person is a statutory employee when we said, "it is often a matter of extreme difficulty to decide whether the work in a given case falls within the designation of the statute. It is in each case largely a question of degree and of fact . . . ." 190 S.C. at 361, 2 S.E.2d at 835 (quoting *Fox v. Fafnir Bearing Co.*, 139 A. 778, 779 (Conn. 1928)). This language from *Marchbanks* is essentially the same language we used in *Bridges*, so the cited language in *Bridges* does not, in my view, mark the beginning of a movement toward a narrower view of the statutory employee analysis.

My second disagreement with the majority's conclusion that *Bridges* signaled our movement toward a narrower view is more basic. Keep in mind there are three tests for determining whether a worker is a statutory employee. Our appellate decisions have typically required an analysis of the first two tests—whether the work performed was an important part of or necessary, essential, or integral to the owner's trade or business. There is a third test—whether the work had been previously performed by employees of the owner. Our focus in *Bridges* was upon that third test, and we noted the repair work performed on the owner's transmission lines was customarily done by the owner's regular employees; however, because those employees were overworked and needed rest, the owner contracted the work out to Collins Electric Company, the direct employer of the worker who was ultimately injured. We held the injured worker was the owner's statutory employee because the work he performed "was a part of the work ordinarily and customarily performed by the employees of the [owner] in the prosecution of the [owner's] business." *Bridges*, 243 S.C. at 12, 132 S.E.2d at 23. Consequently, *Bridges* does not represent a narrowing of our view in comparison with our earlier decisions in which we determined whether a worker's activity was an important, necessary, essential, or integral part of the owner's business.

The logic of our case-by-case approach to the statutory employee issue was evident in *Wilson v. Daniel International Corp.*, 260 S.C. 548, 197 S.E.2d 686 (1973). Daniel was building its plant in Georgetown and needed mixed concrete for construction. Daniel had three choices: (1) mix the concrete on the construction site using its own employees; (2) get concrete made by its employees from its concrete division; or (3) purchase concrete from an outside source. Daniel chose the third

option and bought the concrete from Winyah. Winyah employees mixed the concrete at Winyah's plant. A Winyah worker was delivering the mixed concrete to the Daniel site when he was injured by the negligence of a Daniel employee. The worker sued Daniel for negligence, and Daniel asserted the statutory employee defense.

In its discussion of *Wilson*, the majority states "our recognition of the importance of [Daniel's] corporate decision making is inescapable." I read *Wilson* to say what it actually said: under the facts of that case, Winyah's worker was not Daniel's statutory employee because Winyah and Daniel's relationship was that of vendor-vendee and because "Winyah was not engaged in the execution or performance of any part of Daniel's work." 260 S.C. at 554, 197 S.E.2d at 689.

The majority reads *Glass* as our further recognition of and respect for the decisions of "corporate managers." In my view, we need not engage in such a nuanced reading of *Glass*. I believe *Glass* is yet another good example of the case-by-case approach. In *Glass*, facade panels installed on an MUSC building began to crack. 325 S.C. at 200, 482 S.E.2d at 50. Dow Chemical did not make or install the panels, but rather manufactured a product called Sarabond that was mixed with the mortar used in constructing the panels. MUSC claimed the Sarabond was causing the panels to crack. Dow agreed to settle the dispute with MUSC by removing the old panels and replacing them with a panel that did not contain Sarabond. As part of the settlement, Dow hired a supervising contractor, which hired a removal contractor, which hired another company to provide welders to remove the bolts and clips that held the defective panels in place. The bolts and clips were painted with lead paint, and when welders removed the bolts and clips, the bolts and clips emitted toxic lead fumes. Mr. Glass was one of the welders, and he claimed he was permanently disabled by lead poisoning when he ingested the fumes. He sued Dow, and Dow claimed it was Glass's statutory employer and thus not liable to him in tort.

The trial court disagreed with Dow and struck the statutory employee defense, and the court of appeals affirmed. This Court granted a writ of certiorari to Dow and affirmed the court of appeals. We repeated the three tests for determining whether a worker is a statutory employee, and we again noted "no easily applied formula can be laid down for determining whether work in a particular case meets these tests, [so] each case must be decided on its own facts." *Id.* at 201, 482 S.E.2d at 51. We applied the facts to the first test and concluded replacement of the Sarabond panels was not an important part of Dow's business, as the welders' activities "were not related to the basic operation of Dow's business of manufacturing Sarabond. Instead, [the welders'] activities stemmed simply from Dow's desire to avoid litigation costs." *Id.* at 202, 482 S.E.2d at 51. Applying the second test, we held Dow's replacement

of the panels with panels containing the product of another manufacturer "was not a necessary, integral, or essential part of its [manufacturing] business." *Id*. at 202-03, 482 S.E.2d at 51. In explaining this conclusion, we noted, "Regardless of how Dow determines to settle its dispute with MUSC, the manufacturing of Sarabond can continue." *Id*. at 203, 482 S.E.2d at 51. In concluding the third test did not rescue Dow's statutory employee defense, we noted "none of Dow's regular employees have ever engaged in construction work . . . ." *Id.* at 204, 482 S.E.2d at 52.

I do not read *Glass* as anything but a logical application of the three tests to the facts of that case. Therefore, I respectfully disagree with the majority that *Glass*—and *Wilson* and *Bridges* before it—signaled the beginning of our recognition of corporate decision-making as a primary consideration in determining whether a worker is a statutory employee.

The determination of whether a worker is a statutory employee depends upon the facts and circumstances of the case. "[T]here is no easily applied formula and each case must be decided on its own facts." *Abbott*, 338 S.C. at 163, 526 S.E.2d at 514. "[T]he tests established to interpret [section 42-1-400] do not eliminate the need for an individualized determination of the facts of each case in which statutory employment is alleged." *Olmstead*, 354 S.C. at 426, 581 S.E.2d at 486. In the instant case, the majority summarizes Seay's job responsibilities as "involv[ing] maintaining and repairing pumps, valves, condensers, and other equipment in the piping network [at the Hoechst plant]." I believe it is important to note the following facts as well: the plant manufactured synthetic fibers; Seay was one of 500 Daniel employees who worked full time at the Hoechst plant; the manufacturing equipment Seay worked on included steam lines, valves, gear boxes, condensers, and pumps, all of which were integral to the efficient operation of the plant's production of the fibers; according to Seay, if these components didn't operate, the plant wouldn't run; during the time Seay worked at the plant from 1969 through 1978, he worked as a millwright and maintained the foregoing equipment; Seay's job was so integral to the operation of the plant, about once a year, portions of the plant would shut down so Seay could perform repairs necessary to resume operations; the plant provided all supplies for Seay's work; and a Hoechst employee, known as a "lead man," provided instructions to Seay's supervisor at Daniel, who then assigned daily job duties to Seay. The totality of these circumstances satisfies two of the three tests re-enumerated in *Olmstead*: Seay's daily work activities were "an important part of [Hoechst's] business or trade," and they were "a necessary, essential, and integral part of [Hoechst's] business," the production of synthetic fibers. 354 S.C. at 424, 581 S.E.2d at 485.

Even under the narrower view approved by the majority, Seay's status as a statutory employee of Hoechst was much stronger than the employees in our prior cases in which we held the employee <u>was</u> a statutory employee. In that respect, Seay's status as a statutory employee does not depend upon what the majority contends is an outdated and overly broad application of the doctrine. Seay was much more than the statutory employee who painted Duke Power power poles once every two years while directly employed by a company with which Duke Power contracted to do the work (*Marchbanks*); he was much more than the statutory employee who painted a water tower at the Pacific Mills plant (*Boseman*); he was much more than the statutory employee of a power company who climbed a power pole and fell to his death (*Bell*); and he was much more than the statutory employee who repaired a transmission line owned by a plant and over which electric current traveled to power plant machinery (*Bridges*).

Finally, I do not understand how the majority's new affinity for the evolution of decision-making of business managers and the majority's new emphasis on the "modern economy" is relevant to our analysis of Seay's employment status from 1969 through 1978. That was a time frame that certainly did not fall within the period of the "modern economy." Consequently, an analysis that considers "the ever-increasing competitive challenges businesses face" in the Amazon and Uber economy is misplaced. Under the facts of this case, I would hold Seay was Hoechst's statutory employee.

## II.

The majority writes that it is not adopting a different standard for reviewing the application of the statutory employee doctrine depending upon whether the worker invokes the doctrine to obtain workers' compensation benefits or whether the owner invokes the doctrine as a defense to civil liability. As the majority notes, in *Olmstead*, this Court rejected the court of appeals' conclusion that the underlying rationale of favoring workers' compensation coverage for employees "is not as pertinent where the statutory employee definition and exclusive remedy provision are used as a shield to prevent recovery under another theory." *Olmstead v. Shakespeare*, 348 S.C. 436, 441, 559 S.E.2d 370, 373 (Ct. App. 2002), *aff'd as modified*, 354 S.C. 421, 427, 581 S.E.2d 483, 486. And as noted by the majority, we declined in *Olmstead* to adopt a differing standard of review for cases in which the statutory employment theory is used as a defense to civil liability. 354 S.C. at 427, 581 S.E.2d at 486. The majority then states, "We decline again to do so today."

I have no doubt that many reading the majority opinion will believe this case signals a trend toward the application of a different standard, much in the same way the

majority believes *Bridges*, *Wilson*, and *Glass* signaled the beginning of a trend away from the reasoning of *Marchbanks*, *Boseman*, and *Bell* on the issue of whether work falls within the trade, business, or occupation of an owner. The majority's comment that the "original purposes [of the statutory employee doctrine] are certainly not served by granting CNA Holdings immunity for its wrongful conduct" will be taken to heart, in spite of the majority's professed refusal to adopt a new standard.

## III.

Under the facts of this case, I would reverse the court of appeals and hold Mr. Seay was a statutory employee of Hoechst.

**KITTREDGE, J., concurs.**